# UNITED STATES *v.* ALVAREZ-MACHAIN

No. 91–712.   Argued April 1, 1992—Decided June 15, 1992

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN and O'CONNOR, JJ., joined, *post,* p. 670.

*Solicitor General Starr* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Mueller, Deputy Solicitor General Bryson, Michael R. Dreeben,* and *Kathleen A. Felton.*

*Paul L. Hoffman* argued the cause for respondent. With him on the brief were *Ralph G. Steinhardt, Robin S. Toma, Mark D. Rosenbaum, John A. Powell, Steven R. Shapiro, Kate Martin,* and *Robert Steinberg.**

---

*Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Government of Canada by *Axel Kleiboemer;* for the United Mexican States by *Bruno A. Ristau* and *Michael Abbell;* for the Allard K. Lowenstein International Human Rights Clinic et al. by *Harold Hongju Koh, Michael Ratner, Peter Weiss,* and *David Cole;* for the Association of the Bar of the City of New York by *Sidney S. Rosdeitcher;* for the International Human Rights Law Group by *Paul Nielson* and *Steven M. Schneebaum;* for the Lawyers Committee for Human Rights by *Ruth Wedgwood;* for the Minnesota Lawyers International Human Rights Committee by *David S. Weissbrodt;* and for Rene Martin Verdugo-Urquidez by *Patrick Q. Hall* and *Charles L. Goldberg.*

*Kenneth Roth* and *Stephen M. Kristovich* filed a brief for Americas Watch as *amicus curiae.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The issue in this case is whether a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, thereby acquires a defense to the jurisdiction of this country's courts. We hold that he does not, and that he may be tried in federal district court for violations of the criminal law of the United States.

Respondent, Humberto Alvarez-Machain, is a citizen and resident of Mexico. He was indicted for participating in the kidnap and murder of United States Drug Enforcement Administration (DEA) special agent Enrique Camarena-Salazar and a Mexican pilot working with Camarena, Alfredo Zavala-Avelar.[1] The DEA believes that respondent, a medical doctor, participated in the murder by prolonging Agent Camarena's life so that others could further torture and interrogate him. On April 2, 1990, respondent was forcibly kidnaped from his medical office in Guadalajara, Mexico, to be flown by private plane to El Paso, Texas, where he was arrested by DEA officials. The District Court concluded that DEA agents were responsible for respondent's abduction, although they were not personally involved in it. *United States* v. *Caro-Quintero*, 745 F. Supp. 599, 602–604, 609 (CD Cal. 1990).[2]

---

[1] Respondent is charged in a sixth superseding indictment with: conspiracy to commit violent acts in furtherance of racketeering activity (in violation of 18 U. S. C. §§ 371, 1959); committing violent acts in furtherance of racketeering activity (in violation of § 1959(a)(2)); conspiracy to kidnap a federal agent (in violation of §§ 1201(a)(5), (c)); kidnap of a federal agent (in violation of § 1201(a)(5)); and felony murder of a federal agent (in violation of §§ 1111(a), 1114). App. 12–32.

[2] Apparently, DEA officials had attempted to gain respondent's presence in the United States through informal negotiations with Mexican officials, but were unsuccessful. DEA officials then, through a contact in Mexico, offered to pay a reward and expenses in return for the delivery of respondent to the United States. *United States* v. *Caro-Quintero*, 745 F. Supp., at 602–604.

Respondent moved to dismiss the indictment, claiming that his abduction constituted outrageous governmental conduct, and that the District Court lacked jurisdiction to try him because he was abducted in violation of the extradition treaty between the United States and Mexico. Extradition Treaty, May 4, 1978, [1979] United States-United Mexican States, 31 U. S. T. 5059, T. I. A. S. No. 9656 (Extradition Treaty or Treaty). The District Court rejected the outrageous governmental conduct claim, but held that it lacked jurisdiction to try respondent because his abduction violated the Extradition Treaty. The District Court discharged respondent and ordered that he be repatriated to Mexico. 745 F. Supp., at 614.

The Court of Appeals affirmed the dismissal of the indictment and the repatriation of respondent, relying on its decision in *United States* v. *Verdugo-Urquidez*, 939 F. 2d 1341 (CA9 1991), cert. pending, No. 91–670. 946 F. 2d 1466 (1991). In *Verdugo*, the Court of Appeals held that the forcible abduction of a Mexican national with the authorization or participation of the United States violated the Extradition Treaty between the United States and Mexico.[3] Although the Treaty does not expressly prohibit such abductions, the Court of Appeals held that the "purpose" of the Treaty was violated by a forcible abduction, 939 F. 2d, at 1350, which, along with a formal protest by the offended nation, would give a defendant the right to invoke the Treaty violation to defeat jurisdiction of the District Court to try him.[4] The Court of Appeals further held that the proper remedy for

---

[3] Rene Martin Verdugo-Urquidez was also indicted for the murder of Agent Camarena. In an earlier decision, we held that the Fourth Amendment did not apply to a search by United States agents of Verdugo-Urquidez' home in Mexico. *United States* v. *Verdugo-Urquidez*, 494 U. S. 259 (1990).

[4] The Court of Appeals remanded for an evidentiary hearing as to whether Verdugo's abduction had been authorized by authorities in the United States. *United States* v. *Verdugo-Urquidez*, 939 F. 2d, at 1362.

such a violation would be dismissal of the indictment and repatriation of the defendant to Mexico.

In the instant case, the Court of Appeals affirmed the District Court's finding that the United States had authorized the abduction of respondent, and that letters from the Mexican Government to the United States Government served as an official protest of the Treaty violation. Therefore, the Court of Appeals ordered that the indictment against respondent be dismissed and that respondent be repatriated to Mexico. 946 F. 2d, at 1467. We granted certiorari, 502 U. S. 1024 (1992), and now reverse.

Although we have never before addressed the precise issue raised in the present case, we have previously considered proceedings in claimed violation of an extradition treaty and proceedings against a defendant brought before a court by means of a forcible abduction. We addressed the former issue in *United States* v. *Rauscher,* 119 U. S. 407 (1886); more precisely, the issue whether the Webster-Ashburton Treaty of 1842, 8 Stat. 576, which governed extraditions between England and the United States, prohibited the prosecution of defendant Rauscher for a crime other than the crime for which he had been extradited. Whether this prohibition, known as the doctrine of specialty, was an intended part of the treaty had been disputed between the two nations for some time. *Rauscher,* 119 U. S., at 411. Justice Miller delivered the opinion of the Court, which carefully examined the terms and history of the treaty; the practice of nations in regards to extradition treaties; the case law from the States; and the writings of commentators, and reached the following conclusion:

> "[A] person who has been brought within the jurisdiction of the court *by virtue of proceedings under an extradition treaty,* can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him,

after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings." *Id.*, at 430 (emphasis added).

In addition, Justice Miller's opinion noted that any doubt as to this interpretation was put to rest by two federal statutes which imposed the doctrine of specialty upon extradition treaties to which the United States was a party. *Id.*, at 423.[5] Unlike the case before us today, the defendant in *Rauscher* had been brought to the United States by way of an extradition treaty; there was no issue of a forcible abduction.

In *Ker* v. *Illinois*, 119 U. S. 436 (1886), also written by Justice Miller and decided the same day as *Rauscher*, we addressed the issue of a defendant brought before the court by way of a forcible abduction. Frederick Ker had been tried and convicted in an Illinois court for larceny; his presence before the court was procured by means of forcible abduction from Peru. A messenger was sent to Lima with the proper warrant to demand Ker by virtue of the extradition treaty between Peru and the United States. The messenger, however, disdained reliance on the treaty processes, and instead forcibly kidnaped Ker and brought him to the United States.[6] We distinguished Ker's case from *Rauscher*, on the basis that Ker was not brought into the United States by virtue of the extradition treaty between the United States and Peru, and rejected Ker's argument that he had a right

---

[5] Justice Gray, concurring, would have rested the decision on the basis of these Acts of Congress alone. *Rauscher*, 119 U. S., at 433. Chief Justice Waite dissented, concluding that the treaty did not forbid trial on a charge other than that on which extradition was granted, and that the Acts of Congress did not change the "effect of the treaty." *Id.*, at 436.

[6] Although the opinion does not explain why the messenger failed to present the warrant to the proper authorities, commentators have suggested that the seizure of Ker in the aftermath of a revolution in Peru provided the messenger with no "proper authorities" to whom the warrant could be presented. See Kester, Some Myths of United States Extradition Law, 76 Geo. L. J. 1441, 1451 (1988).

under the extradition treaty to be returned to this country only in accordance with its terms.[7]  We rejected Ker's due process argument more broadly, holding in line with "the highest authorities" that "such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court."  *Ker, supra,* at 444.

In *Frisbie* v. *Collins,* 342 U. S. 519, rehearing denied, 343 U. S. 937 (1952), we applied the rule in *Ker* to a case in which the defendant had been kidnaped in Chicago by Michigan officers and brought to trial in Michigan.  We upheld the conviction over objections based on the Due Process Clause and the federal Kidnaping Act and stated:

> "This Court has never departed from the rule announced in *[Ker]* that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'  No persuasive reasons are now presented to justify overruling this line of cases.  They

---

[7] In the words of Justice Miller, the "treaty was not called into operation, was not relied upon, was not made the pretext of arrest, and the facts show that it was a clear case of kidnapping within the dominions of Peru, without any pretence of authority under the treaty or from the government of the United States."  *Ker* v. *Illinois,* 119 U. S., at 443.

Two cases decided during the Prohibition Era in this country have dealt with seizures claimed to have been in violation of a treaty entered into between the United States and Great Britain to assist the United States in offshore enforcement of its prohibition laws, and to allow British passenger ships to carry liquor while in the waters of the United States.  43 Stat. 1761 (1924).  The history of the negotiations leading to the treaty is set forth in *Cook* v. *United States,* 288 U. S. 102, 111–118 (1933).  In that case we held that the treaty provision for seizure of British vessels operating beyond the 3-mile limit was intended to be exclusive, and that therefore liquor seized from a British vessel in violation of the treaty could not form the basis of a conviction.

In *Ford* v. *United States,* 273 U. S. 593 (1927), the argument as to personal jurisdiction was deemed to have been waived.

.rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie, supra,* at 522 (citation and footnote omitted).[8]

The only differences between *Ker* and the present case are that *Ker* was decided on the premise that there was no governmental involvement in the abduction, 119 U. S., at 443; and Peru, from which Ker was abducted, did not object to his prosecution.[9] Respondent finds these differences to be dispositive, as did the Court of Appeals in *Verdugo,* 939 F. 2d, at 1346, contending that they show that respondent's prosecution, like the prosecution of Rauscher, violates the implied terms of a valid extradition treaty. The Government, on the other hand, argues that *Rauscher* stands as an "exception" to the rule in *Ker* only when an extradition treaty is invoked, and the terms of the treaty provide that its breach will limit the jurisdiction of a court. Brief for United States 17. Therefore, our first inquiry must be whether the abduction of respondent from Mexico violated the Extradition Treaty between the United States and Mexico. If we conclude that the Treaty does not prohibit respondent's abduction, the rule in *Ker* applies, and the court need not inquire as to how respondent came before it.

---

[8] We have applied *Ker* to numerous cases where the presence of the defendant was obtained by an interstate abduction. See, *e. g., Mahon* v. *Justice,* 127 U. S. 700 (1888); *Cook* v. *Hart,* 146 U. S. 183 (1892); *Pettibone* v. *Nichols,* 203 U. S. 192, 215–216 (1906).

[9] Ker also was not a national of Peru, whereas respondent is a national of the country from which he was abducted. Respondent finds this difference to be immaterial. Tr. of Oral Arg. 26.

In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning. *Air France* v. *Saks*, 470 U. S. 392, 397 (1985); *Valentine* v. *United States ex rel. Neidecker*, 299 U. S. 5, 11 (1936). The Treaty says nothing about the obligations of the United States and Mexico to refrain from forcible abductions of people from the territory of the other nation, or the consequences under the Treaty if such an abduction occurs. Respondent submits that Article 22(1) of the Treaty, which states that it "shall apply to offenses specified in Article 2 [including murder] committed before and after this Treaty enters into force," 31 U. S. T., at 5073–5074, evidences an intent to make application of the Treaty mandatory for those offenses. However, the more natural conclusion is that Article 22 was included to ensure that the Treaty was applied to extraditions requested after the Treaty went into force, regardless of when the crime of extradition occurred.[10]

More critical to respondent's argument is Article 9 of the Treaty, which provides:

"1. Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

"2. If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense." *Id.*, at 5065.

---

[10] This interpretation is supported by the second clause of Article 22, which provides that "[r]equests for extradition that are under process on the date of the entry into force of this Treaty, shall be resolved in accordance with the provisions of the Treaty of 22 February, 1899, . . . ." Extradition Treaty, May 4, 1978, [1979] United States-United Mexican States, 31 U. S. T. 5059, 5074, T. I. A. S. No. 9656.

According to respondent, Article 9 embodies the terms of the bargain which the United States struck: If the United States wishes to prosecute a Mexican national, it may request that individual's extradition. Upon a request from the United States, Mexico may either extradite the individual or submit the case to the proper authorities for prosecution in Mexico. In this way, respondent reasons, each nation preserved its right to choose whether its nationals would be tried in its own courts or by the courts of the other nation. This preservation of rights would be frustrated if either nation were free to abduct nationals of the other nation for the purposes of prosecution. More broadly, respondent reasons, as did the Court of Appeals, that all the processes and restrictions on the obligation to extradite established by the Treaty would make no sense if either nation were free to resort to forcible kidnaping to gain the presence of an individual for prosecution in a manner not contemplated by the Treaty. *Verdugo, supra,* at 1350.

We do not read the Treaty in such a fashion. Article 9 does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution. In the absence of an extradition treaty, nations are under no obligation to surrender those in their country to foreign authorities for prosecution. *Rauscher,* 119 U. S., at 411–412; *Factor* v. *Laubenheimer,* 290 U. S. 276, 287 (1933); cf. *Valentine* v. *United States ex rel. Neidecker, supra,* at 8–9 (United States may not extradite a citizen in the absence of a statute or treaty obligation). Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures. See 1 J. Moore, A Treatise on Extradition and Interstate Rendition § 72 (1891). The Treaty thus provides a mechanism which would not otherwise exist, requiring, under certain circumstances, the United States and Mexico to extradite individuals to the

other country, and establishing the procedures to be followed when the Treaty is invoked.

The history of negotiation and practice under the Treaty also fails to show that abductions outside of the Treaty constitute a violation of the Treaty. As the Solicitor General notes, the Mexican Government was made aware, as early as 1906, of the *Ker* doctrine, and the United States' position that it applied to forcible abductions made outside of the terms of the United States-Mexico Extradition Treaty.[11] Nonetheless, the current version of the Treaty, signed in 1978, does not attempt to establish a rule that would in any way curtail the effect of *Ker*.[12] Moreover, although language which would grant individuals exactly the right sought by respondent had been considered and drafted as

---

[11] In correspondence between the United States and Mexico growing out of the 1905 Martinez incident, in which a Mexican national was abducted from Mexico and brought to the United States for trial, the Mexican Chargé wrote to the Secretary of State protesting that as Martinez' arrest was made outside of the procedures established in the extradition treaty, "the action pending against the man can not rest [on] any legal foundation." Letter of Balbino Davalos to Secretary of State, reprinted in Papers Relating to the Foreign Relations of the United States, H. R. Doc. No. 1, 59th Cong., 2d Sess., pt. 2, p. 1121 (1906). The Secretary of State responded that the exact issue raised by the Martinez incident had been decided by *Ker*, and that the remedy open to the Mexican Government, namely, a request to the United States for extradition of Martinez' abductor, had been granted by the United States. Letter of Robert Bacon to Mexican Chargé, reprinted in Papers Relating to the Foreign Relations of the United States, H. R. Doc. No. 1, *supra*, at 1121–1122.

Respondent and the Court of Appeals stress a statement made in 1881 by Secretary of State James Blaine to the Governor of Texas to the effect that the extradition treaty in its form at that time did not authorize unconsented to abductions from Mexico. *Verdugo*, 939 F. 2d, at 1354; Brief for Respondent 14. This misses the mark, however, for the Government's argument is not that the Treaty authorizes the abduction of respondent, but that the Treaty does not prohibit the abduction.

[12] The parties did expressly include the doctrine of specialty in Article 17 of the Treaty, notwithstanding the judicial recognition of it in *United States* v. *Rauscher*, 119 U. S. 407 (1886). 31 U. S. T., at 5071–5072.

early as 1935 by a prominent group of legal scholars sponsored by the faculty of Harvard Law School, no such clause appears in the current Treaty.[13]

Thus, the language of the Treaty, in the context of its history, does not support the proposition that the Treaty prohibits abductions outside of its terms. The remaining question, therefore, is whether the Treaty should be interpreted so as to include an implied term prohibiting prosecution where the defendant's presence is obtained by means other than those established by the Treaty. See *Valentine*, 299 U. S., at 17 ("Strictly the question is not whether there had been a uniform practical construction denying the power, but whether the power had been so clearly recognized that the grant should be implied").

Respondent contends that the Treaty must be interpreted against the backdrop of customary international law, and that international abductions are "so clearly prohibited in international law" that there was no reason to include such a clause in the Treaty itself. Brief for Respondent 11. The international censure of international abductions is further evidenced, according to respondent, by the United Nations Charter and the Charter of the Organization of American States. *Id.*, at 17. Respondent does not argue that these sources of international law provide an independent basis for the right respondent asserts not to be tried in the United States, but rather that they should inform the interpretation of the Treaty terms.

---

[13] In Article 16 of the Draft Convention on Jurisdiction with Respect to Crime, the Advisory Committee of the Research in International Law proposed:

"In exercising jurisdiction under this Convention, no State shall prosecute or punish any person who has been brought within its territory or a place subject to its authority by recourse to measures in violation of international law or international convention without first obtaining the consent of the State or States whose rights have been violated by such measures." Harvard Research in International Law, 29 Am. J. Int'l L. 442 (Supp. 1935).

The Court of Appeals deemed it essential, in order for the individual defendant to assert a right under the Treaty, that the affected foreign government had registered a protest. *Verdugo*, 939 F. 2d, at 1357 ("[I]n the kidnapping case there must be a formal protest from the offended government after the kidnapping"). Respondent agrees that the right exercised by the individual is derivative of the nation's right under the Treaty, since nations are authorized, notwithstanding the terms of an extradition treaty, to voluntarily render an individual to the other country on terms completely outside of those provided in the treaty. The formal protest, therefore, ensures that the "offended" nation actually objects to the abduction and has not in some way voluntarily rendered the individual for prosecution. Thus the Extradition Treaty only prohibits gaining the defendant's presence by means other than those set forth in the Treaty when the nation from which the defendant was abducted objects.

This argument seems to us inconsistent with the remainder of respondent's argument. The Extradition Treaty has the force of law, and if, as respondent asserts, it is self-executing, it would appear that a court must enforce it on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation. In *Rauscher*, the Court noted that Great Britain had taken the position in other cases that the Webster-Ashburton Treaty included the doctrine of specialty, but no importance was attached to whether or not Great Britain had protested the prosecution of Rauscher for the crime of cruel and unusual punishment as opposed to murder.

More fundamentally, the difficulty with the support respondent garners from international law is that none of it relates to the practice of nations in relation to extradition treaties. In *Rauscher*, we implied a term in the Webster-Ashburton Treaty because of the practice of nations with regard to extradition treaties. In the instant case, respond-

ent would imply terms in the Extradition Treaty from the practice of nations with regards to international law more generally.[14] Respondent would have us find that the Treaty acts as a prohibition against a violation of the general principle of international law that one government may not "exercise its police power in the territory of another state." Brief for Respondent 16. There are many actions which could be taken by a nation that would violate this principle, including waging war, but it cannot seriously be contended that an invasion of the United States by Mexico would violate the terms of the Extradition Treaty between the two nations.[15]

In sum, to infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual

---

[14] Similarly, the Court of Appeals in *Verdugo* reasoned that international abductions violate the "purpose" of the Treaty, stating that "[t]he requirements extradition treaties impose constitute a means of safeguarding the sovereignty of the signatory nations, as well as ensuring the fair treatment of individuals." 939 F. 2d, at 1350. The ambitious purpose ascribed to the Treaty by the Court of Appeals, we believe, places a greater burden on its language and history than they can logically bear. In a broad sense, most international agreements have the common purpose of safeguarding the sovereignty of signatory nations, in that they seek to further peaceful relations between nations. This, however, does not mean that the violation of any principle of international law constitutes a violation of this particular treaty.

[15] In the same category are the examples cited by respondent in which, after a forcible international abduction, the offended nation protested the abduction and the abducting nation then returned the individual to the protesting nation. Brief for Respondent 18, citing, *inter alia*, 1 Bassiouni, International Extradition: United States Law and Practice § 5.4, pp. 235–237 (2d rev. ed. 1987). These may show the practice of nations under customary international law, but they are of little aid in construing the terms of an extradition treaty, or the authority of a court to later try an individual who has been so abducted. More to the point for our purposes are cases such as *The Richmond*, 9 Cranch 102 (1815), and *The Merino*, 9 Wheat. 391 (1824), both of which hold that a seizure of a vessel in violation of international law does not affect the jurisdiction of a United States court to adjudicate rights in connection with the vessel. These cases are discussed, and distinguished, in *Cook* v. *United States*, 288 U. S., at 122.

outside of its terms goes beyond established precedent and practice. In *Rauscher*, the implication of a doctrine of specialty into the terms of the Webster-Ashburton Treaty, which, by its terms, required the presentation of evidence establishing probable cause of the crime of extradition before extradition was required, was a small step to take. By contrast, to imply from the terms of this Treaty that it prohibits obtaining the presence of an individual by means outside of the procedures the Treaty establishes requires a much larger inferential leap, with only the most general of international law principles to support it. The general principles cited by respondent simply fail to persuade us that we should imply in the United States-Mexico Extradition Treaty a term prohibiting international abductions.

Respondent and his *amici* may be correct that respondent's abduction was "shocking," Tr. of Oral Arg. 40, and that it may be in violation of general international law principles. Mexico has protested the abduction of respondent through diplomatic notes, App. 33–38, and the decision of whether respondent should be returned to Mexico, as a matter outside of the Treaty, is a matter for the Executive Branch.[16] We

---

[16] The Mexican Government has also requested from the United States the extradition of two individuals it suspects of having abducted respondent in Mexico, on charges of kidnaping. App. 39–66.

The advantage of the diplomatic approach to the resolution of difficulties between two sovereign nations, as opposed to unilateral action by the courts of one nation, is illustrated by the history of the negotiations leading to the treaty discussed in *Cook* v. *United States, supra.* The United States was interested in being able to search British vessels that hovered beyond the 3-mile limit and served as supply ships for motor launches, which took intoxicating liquor from them into ports for further distribution in violation of prohibition laws. The United States initially proposed that both nations agree to searches of the other's vessels beyond the 3-mile limit; Great Britain rejected such an approach, since it had no prohibition laws and therefore no problem with United States vessels hovering just beyond its territorial waters. The parties appeared to be at loggerheads; then this Court decided *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100 (1923), holding that our prohibition laws applied to foreign merchant ves-

conclude, however, that respondent's abduction was not in violation of the Extradition Treaty between the United States and Mexico, and therefore the rule of *Ker* v. *Illinois* is fully applicable to this case. The fact of respondent's forcible abduction does not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States.

The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, dissenting.

The Court correctly observes that this case raises a question of first impression. See *ante,* at 659. The case is unique for several reasons. It does not involve an ordinary abduction by a private kidnaper, or bounty hunter, as in *Ker* v. *Illinois,* 119 U. S. 436 (1886); nor does it involve the apprehension of an American fugitive who committed a crime in one State and sought asylum in another, as in *Frisbie* v. *Collins,* 342 U. S. 519 (1952). Rather, it involves this country's abduction of another country's citizen; it also involves a violation of the territorial integrity of that other country, with which this country has signed an extradition treaty.

A Mexican citizen was kidnaped in Mexico and charged with a crime committed in Mexico; his offense allegedly violated both Mexican and American law. Mexico has formally

---

sels as well as domestic within the territorial waters of the United States, and that therefore the carrying of intoxicating liquors by foreign passenger ships violated those laws. A treaty was then successfully negotiated, giving the United States the right to seizure beyond the 3-mile limit (which it desired), and giving British passenger ships the right to bring liquor into United States waters so long as the liquor supply was sealed while in those waters (which Great Britain desired). *Cook* v. *United States, supra.*

demanded on at least two separate occasions[1] that he be returned to Mexico and has represented that he will be prosecuted and, if convicted, punished for his offense.[2]  It is clear that Mexico's demand must be honored if this official abduction violated the 1978 Extradition Treaty between the United States and Mexico.  In my opinion, a fair reading of the treaty in light of our decision in *United States* v. *Rauscher,* 119 U. S. 407 (1886), and applicable principles of international law, leads inexorably to the conclusion that the District Court, *United States* v. *Caro-Quintero,* 745 F. Supp. 599 (CD Cal. 1990), and the Court of Appeals for the Ninth Circuit, 946 F. 2d 1466 (1991) *(per curiam),* correctly construed that instrument.

I

The extradition treaty with Mexico[3] is a comprehensive document containing 23 articles and an appendix listing the

---

[1] The abduction of respondent occurred on April 2, 1990.  *United States* v. *Caro-Quintero,* 745 F. Supp. 599, 603 (CD Cal. 1990).  Mexico responded quickly and unequivocally.  Tr. of Oral Arg. 33; Brief for Respondent 3. On April 18, 1990, Mexico requested an official report on the role of the United States in the abduction, and on May 16, 1990, and July 19, 1990, it sent diplomatic notes of protest from the Embassy of Mexico to the United States Department of State.  See Brief for United Mexican States as *Amicus Curiae* (Mexican *Amicus*) 5–6; App. to Mexican *Amicus* 1a–24a. In the May 16th note, Mexico said that it believed that the abduction was "carried out with the knowledge of persons working for the U. S. government, in violation of the procedure established in the extradition treaty in force between the two countries," *id.,* at 5a, and in the July 19th note, it requested the provisional arrest and extradition of the law enforcement agents allegedly involved in the abduction.  *Id.,* at 9a–15a.

[2] Mexico has already tried a number of members involved in the conspiracy that resulted in the murder of the Drug Enforcement Administration agent.  For example, Rafael Caro-Quintero, a co-conspirator of Alvarez-Machain in this case, has already been imprisoned in Mexico on a 40-year sentence.  See Brief for Lawyers Committee for Human Rights as *Amicus Curiae* 4.

[3] Extradition Treaty, May 4, 1978, [1979] United States-United Mexican States, 31 U. S. T. 5059, T. I. A. S. No. 9656 (Treaty or Extradition Treaty).

extraditable offenses covered by the agreement. The parties announced their purpose in the preamble: The two governments desire "to cooperate more closely in the fight against crime and, to this end, to mutually render better assistance in matters of extradition."[4] From the preamble, through the description of the parties' obligations with respect to offenses committed within as well as beyond the territory of a requesting party,[5] the delineation of the procedures and evidentiary requirements for extradition,[6] the spe-

---

[4] *Id.*, at 5061. In construing a treaty, the Court has the "responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Air France* v. *Saks*, 470 U. S. 392, 399 (1985). It is difficult to see how an interpretation that encourages unilateral action could foster cooperation and mutual assistance—the stated goals of the Treaty. See also Presidential Letter of Transmittal attached to Senate Advice and Consent 3 (Treaty would "make a significant contribution to international cooperation in law enforcement").

Extradition treaties prevent international conflict by providing agreed-upon standards so that the parties may cooperate and avoid retaliatory invasions of territorial sovereignty. According to one writer, before extradition treaties became common, European states often granted asylum to fugitives from other states, with the result that "a sovereign could enforce the return of fugitives only by force of arms . . . . Extradition as an inducement to peaceful relations and friendly cooperation between states remained of little practical significance until after World War I." M. Bassiouni, International Extradition and World Public Order 6 (1974). This same writer explained that such treaties further the purpose of international law, which is "designed to protect the sovereignty and territorial integrity of states, and [to] restrict impermissible state conduct." 1 M. Bassiouni, International Extradition: United States Law and Practice, ch. 5, § 2, p. 194 (2d rev. ed. 1987).

The object of reducing conflict by promoting cooperation explains why extradition treaties do not prohibit informal consensual delivery of fugitives, but why they do prohibit state-sponsored abductions. See Restatement (Third) of Foreign Relations (Restatement) § 432, and Comments *a–c* (1987).

[5] Treaty, 31 U. S. T., at 5062, 5063 (Articles 2 and 4).

[6] *Id.*, at 5063, 5064–5065, 5066–5068, 5069 (Articles 3, 7, 10, 12, and 13).

cial provisions for political offenses and capital punishment,[7] and other details, the Treaty appears to have been designed to cover the entire subject of extradition. Thus, Article 22, entitled "Scope of Application," states that the "Treaty shall apply to offenses specified in Article 2 committed before and after this Treaty enters into force," and Article 2 directs that "[e]xtradition shall take place, subject to this Treaty, for willful acts which fall within any of [the extraditable offenses listed in] the clauses of the Appendix."[8] Moreover, as noted by the Court, *ante*, at 663, Article 9 expressly provides that neither contracting party is bound to deliver up its own nationals, although it may do so in its discretion, but if it does not do so, it "shall submit the case to its competent authorities for purposes of prosecution."[9]

The Government's claim that the Treaty is not exclusive, but permits forcible governmental kidnaping, would transform these, and other, provisions into little more than verbiage. For example, provisions requiring "sufficient" evidence to grant extradition (Art. 3), withholding extradition for political or military offenses (Art. 5), withholding extradition when the person sought has already been tried (Art. 6), withholding extradition when the statute of limitations for the crime has lapsed (Art. 7), and granting the requested country discretion to refuse to extradite an individual who would face the death penalty in the requesting country (Art. 8), would serve little purpose if the requesting country could simply kidnap the person. As the Court of Appeals for the Ninth Circuit recognized in a related case, "[e]ach of these provisions would be utterly frustrated if a kidnapping were held to be a permissible course of governmental conduct." *United States* v. *Verdugo-Urquidez*, 939 F. 2d 1341, 1349 (1991). In addition, all of these provisions "only make sense if they are understood as *requiring* each treaty signatory to

---

[7] *Id.*, at 5063–5064, 5065 (Articles 5 and 8).

[8] *Id.*, at 5073–5074, 5062.

[9] *Id.*, at 5065.

comply with those procedures whenever it wishes to obtain jurisdiction over an individual who is located in another treaty nation." *Id.*, at 1351.

It is true, as the Court notes, that there is no express promise by either party to refrain from forcible abductions in the territory of the other nation. See *ante*, at 664, 665–666. Relying on that omission,[10] the Court, in effect, concludes that the Treaty merely creates an optional method of obtaining jurisdiction over alleged offenders, and that the parties silently reserved the right to resort to self-help whenever they deem force more expeditious than legal process.[11] If the United States, for example, thought it more expedient to torture or simply to execute a person rather than to attempt extradition, these options would be equally available because they, too, were not explicitly prohibited by the Treaty.[12]

---

[10] The Court resorts to the same method of analysis as did the dissent in *United States* v. *Rauscher*, 119 U. S. 407 (1886). Chief Justice Waite would only recognize an explicit provision, and in the absence of one, he concluded that the treaty did not require that a person be tried only for the offense for which he had been extradited: "The treaty requires a delivery up to justice, on demand, of those accused of certain crimes, but says nothing about what shall be done with them after the delivery has been made. It might have provided that they should not be tried for any other offences than those for which they were surrendered, but it has not." *Id.*, at 434. That approach was rejected by the Court in *Rauscher* and should also be rejected by the Court here.

[11] To make the point more starkly, the Court has, in effect, written into Article 9 a new provision, which says: "Notwithstanding paragraphs 1 and 2 of this Article, either Contracting Party can, without the consent of the other, abduct nationals from the territory of one Party to be tried in the territory of the other."

[12] It is ironic that the United States has attempted to justify its unilateral action based on the kidnaping, torture, and murder of a federal agent by authorizing the kidnaping of respondent, for which the American law enforcement agents who participated have now been charged by Mexico. See App. to Mexican *Amicus* 5a. This goes to my earlier point, see n. 4, *supra*, that extradition treaties promote harmonious relations by providing for the orderly surrender of a person by one state to another, and without such treaties, resort to force often followed.

That, however, is a highly improbable interpretation of a consensual agreement,[13] which on its face appears to have been intended to set forth comprehensive and exclusive rules concerning the subject of extradition.[14]   In my opinion, "the manifest scope and object of the treaty itself," *Rauscher*, 119 U. S., at 422, plainly imply a mutual undertaking to respect the territorial integrity of the other contracting party.   That opinion is confirmed by a consideration of the "legal context" in which the Treaty was negotiated.[15]   *Cannon* v. *University of Chicago*, 441 U. S. 677, 699 (1979).

## II

In *Rauscher*, the Court construed an extradition treaty that was far less comprehensive than the 1978 Treaty with Mexico.   The 1842 treaty with Great Britain determined the boundary between the United States and Canada, provided for the suppression of the African slave trade, and also con-

---

[13] This Court has previously described a treaty as generally "in its nature a contract between two nations," *Foster* v. *Neilson*, 2 Pet. 253, 314 (1829); see *Rauscher*, 119 U. S., at 418; it is also in this country the law of the land.   2 Pet., at 314; 119 U. S., at 418–419.

[14] Mexico's understanding is that "[t]he extradition treaty governs comprehensively the delivery of all persons for trial in the requesting state 'for an offense committed outside the territory of the requesting Party.'" Brief for United Mexican States as *Amicus Curiae*, O. T. 1991, No. 91–670, p. 6.   And Canada, with whom the United States also shares a large border and with whom the United States also has an extradition treaty, understands the treaty to be "the exclusive means for a requesting government to obtain . . . a removal" of a person from its territory, unless a nation otherwise gives its consent.   Brief for Government of Canada as *Amicus Curiae* 4.

[15] The United States has offered no evidence from the negotiating record, ratification process, or later communications with Mexico to support the suggestion that a different understanding with Mexico was reached. See Bassiouni, International Extradition: United States Law and Practice, ch. 2, § 4.3, at 82 ("Negotiations, preparatory works, and diplomatic correspondence are an integral part of th[e] surrounding circumstances, and [are] often relied on by courts in ascertaining the intentions of the parties") (footnote omitted).

tained one paragraph authorizing the extradition of fugitives "in certain cases." 8 Stat. 576. In Article X, each nation agreed to "deliver up to justice all persons" properly charged with any one of seven specific crimes, including murder. 119 U. S., at 421.[16] After Rauscher had been extradited for murder, he was charged with the lesser offense of inflicting cruel and unusual punishment on a member of the crew of a vessel on the high seas. Although the treaty did not purport to place any limit on the jurisdiction of the demanding state after acquiring custody of the fugitive, this Court held that he could not be tried for any offense other than murder.[17] Thus, the treaty constituted the exclusive means by which

---

[16] Article X of the Treaty provided:

"It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed: and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition, and receives the fugitive." 8 Stat. 576.

[17] The doctrine defined by the Court in *Rauscher*—that a person can be tried only for the crime for which he had been extradited—has come to be known as the "doctrine of specialty."

the United States could obtain jurisdiction over a defendant within the territorial jurisdiction of Great Britain.

The Court noted that the treaty included several specific provisions, such as the crimes for which one could be extradited, the process by which the extradition was to be carried out, and even the evidence that was to be produced, and concluded that "the fair purpose of the treaty is, that the person shall be delivered up to be tried for that offence and for no other." *Id.*, at 423. The Court reasoned that it did not make sense for the treaty to provide such specifics only to have the person "pas[s] into the hands of the country which charges him with the offence, free from all the positive requirements and just implications of the treaty under which the transfer of his person takes place." *Id.*, at 421. To interpret the treaty in a contrary way would mean that a country could request extradition of a person for one of the seven crimes covered by the treaty, and then try the person for another crime, such as a political crime, which was clearly not covered by the treaty; this result, the Court concluded, was clearly contrary to the intent of the parties and the purpose of the treaty.

Rejecting an argument that the sole purpose of Article X was to provide a procedure for the transfer of an individual from the jurisdiction of one sovereign to another, the Court stated:

> "No such view of solemn public treaties between the great nations of the earth can be sustained by a tribunal called upon to give judicial construction to them.
>
> "The opposite view has been attempted to be maintained in this country upon the ground that there is no express limitation in the treaty of the right of the country in which the offence was committed to try the person for the crime alone for which he was extradited, and that once being within the jurisdiction of that country, no matter by what contrivance or fraud or by what pretence of establishing a charge provided for by the extra-

dition treaty he may have been brought within the jurisdiction, he is, when here, liable to be tried for any offence against the laws as though arrested here originally. This proposition of the absence of express restriction in the treaty of the right to try him for other offences than that for which he was extradited, is met by the manifest scope and object of the treaty itself." *Id.*, at 422.

Thus, the Extradition Treaty, as understood in the context of cases that have addressed similar issues, suffices to protect the defendant from prosecution despite the absence of any express language in the Treaty itself purporting to limit this Nation's power to prosecute a defendant over whom it had lawfully acquired jurisdiction.[18]

Although the Court's conclusion in *Rauscher* was supported by a number of judicial precedents, the holdings in these cases were not nearly as uniform[19] as the consensus of international opinion that condemns one nation's violation of the territorial integrity of a friendly neighbor.[20] It is

---

[18] In its opinion, the Court suggests that the result in *Rauscher* was dictated by the fact that two federal statutes had imposed the doctrine of specialty upon extradition treaties. *Ante*, at 660. The two cited statutes, however, do not contain any language purporting to limit the jurisdiction of the court; rather, they merely provide for protection of the accused pending trial.

[19] In fact, both parties noted in their respective briefs several authorities that had held that a person could be tried for an offense other than the one for which he had been extradited. See Brief for United States in *United States* v. *Rauscher*, O. T. 1885, No. 1249, pp. 6–10 (citing *United States* v. *Caldwell*, 8 Blatchford 131 (SDNY 1871); *United States* v. *Lawrence*, 13 Blatchford 295 (SDNY 1876); *Adriance* v. *Lagrave*, 59 N. Y. 110 (1874)); Brief for Respondent in *United States* v. *Rauscher*, O. T. 1885, No. 1249, pp. 8–16.

[20] This principle is embodied in Article 17 of the Charter of the Organization of American States, Apr. 30, 1948, 2 U. S. T. 2394, T. I. A. S. No. 2361, as amended by the Protocol of Buenos Aires, Feb. 27, 1967, 21 U. S. T. 607, T. I. A. S. No. 6847, as well as numerous provisions of the United Nations Charter, June 26, 1945, 59 Stat. 1031, T. S. No. 993 (to which both the

shocking that a party to an extradition treaty might believe that it has secretly reserved the right to make seizures of citizens in the other party's territory.[21]  Justice Story found it shocking enough that the United States would attempt to justify an American seizure of a foreign vessel in a Spanish port:

> "But, even supposing, for a moment, that our laws had required an entry of The Apollon, in her transit, does it follow that the power to arrest her was meant to be given, after she had passed into the exclusive territory of a foreign nation?  We think not.  *It would be monstrous* to suppose that our revenue officers were authorized to enter into foreign ports and territories, for the purpose of seizing vessels which had offended. against our laws.  It cannot be presumed that congress would voluntarily justify such a clear violation of the laws of nations."  *The Apollon*, 9 Wheat. 362, 370–371 (1824) (emphasis added).[22]

---

United States and Mexico are signatories).  See generally Mann, Reflections on the Prosecution of Persons Abducted in Breach of International Law, in International Law at a Time of Perplexity 407 (Y. Dinstein & M. Tabory eds. 1989).

[21] When Abraham Sofaer, Legal Adviser of the State Department, was questioned at a congressional hearing, he resisted the notion that such seizures were acceptable: " 'Can you imagine us going into Paris and seizing some person we regard as a terrorist . . . ?  [H]ow would we feel if some foreign nation—let us take the United Kingdom—came over here and seized some terrorist suspect in New York City, or Boston, or Philadelphia, . . . because we refused through the normal channels of international, legal communications, to extradite that individual?' "  Bill To Authorize Prosecution of Terrorists and Others Who Attack U. S. Government Employees and Citizens Abroad: Hearing before the Subcommittee on Security and Terrorism of the Senate Committee on the Judiciary, 99th Cong., 1st Sess., 63 (1985).

[22] Justice Story's opinion continued:

"The arrest of the offending vessel must, therefore, be restrained to places where our jurisdiction is complete, to our own waters, or to the ocean, the common highway of all nations.  It is said, that there is a revenue

The law of nations, as understood by Justice Story in 1824, has not changed. Thus, a leading treatise explains:

> "A State must not perform acts of sovereignty in the territory of another State.
>
> .　　　.　　　.　　　.　　　.
>
> "It is . . . a breach of International Law for a State to send its agents to the territory of another State to apprehend persons accused of having committed a crime. Apart from other satisfaction, the first duty of the offending State is to hand over the person in question to the State in whose territory he was apprehended." 1 Oppenheim's International Law 295, and n. 1 (H. Lauterpacht 8th ed. 1955).[23]

Commenting on the precise issue raised by this case, the chief reporter for the American Law Institute's Restatement of Foreign Relations used language reminiscent of Justice Story's characterization of an official seizure in a foreign jurisdiction as "monstrous":

---

jurisdiction, which is distinct from the ordinary maritime jurisdiction over waters within the range of a common shot from our shores. And the provisions in the Collection Act of 1799, which authorize a visitation of vessels within four leagues of our coasts, are referred to in proof of the assertion. But where is that right of visitation to be exercised? In a foreign territory, in the exclusive jurisdiction of another sovereign? Certainly not; for the very terms of the act confine it to the ocean, where all nations have a common right, and exercise a common sovereignty. And over what vessels is this right of visitation to be exercised? By the very words of the act, over our own vessels, and over foreign vessels bound to our ports, and over no others. To have gone beyond this, would have been an usurpation of exclusive sovereignty on the ocean, and an exercise of an universal right of search, a right which has never yet been acknowledged by other nations, and would be resisted by none with more pertinacity than by the American." *The Apollon,* 9 Wheat., at 371–372.

[23] See Restatement § 432, Comment *c* ("If the unauthorized action includes abduction of a person, the state from which the person was abducted may demand return of the person, and international law requires that he be returned").

"When done without consent of the foreign government, abducting a person from a foreign country is a gross violation of international law and gross disrespect for a norm high in the opinion of mankind. It is a blatant violation of the territorial integrity of another state; it eviscerates the extradition system (established by a comprehensive network of treaties involving virtually all states)."[24]

In the *Rauscher* case, the legal background that supported the decision to imply a covenant not to prosecute for an offense different from that for which extradition had been granted was far less clear than the rule against invading the territorial integrity of a treaty partner that supports Mexico's position in this case.[25] If *Rauscher* was correctly decided—and I am convinced that it was—its rationale clearly dictates a comparable result in this case.[26]

---

[24] Henkin, A Decent Respect to the Opinions of Mankind, 25 John Marshall L. Rev. 215, 231 (1992) (footnote omitted).

[25] Thus, the Restatement states in part:

"(2) A state's law enforcement officers may exercise their functions in the territory of another state only with the consent of the other state, given by duly authorized officials of that state.

.        .  .        .              .

"c. *Consequences of violation of territorial limits of law enforcement.* If a state's law enforcement officials exercise their functions in the territory of another state without the latter's consent, that state is entitled to protest and, in appropriate cases, to receive reparation from the offending state. If the unauthorized action includes abduction of a person, the state from which the person was abducted may demand return of the person, and international law requires that he be returned. If the state from which the person was abducted does not demand his return, under the prevailing view the abducting state may proceed to prosecute him under its laws." § 432, and Comment c.

[26] Just as Rauscher had standing to raise the treaty violation issue, respondent may raise a comparable issue in this case. Certainly, if an individual who is not a party to an agreement between the United States and another country is permitted to assert the rights of that country in our courts, as is true in the specialty cases, then the same rule must apply to

## III

A critical flaw pervades the Court's entire opinion. It fails to differentiate between the conduct of private citizens, which does not violate any treaty obligation, and conduct expressly authorized by the Executive Branch of the Government, which unquestionably constitutes a flagrant violation of international law,[27] and in my opinion, also constitutes a breach of our treaty obligations. Thus, at the outset of its opinion, the Court states the issue as "whether a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, thereby acquires a defense to the jurisdiction of this country's courts." *Ante*, at 657. That, of course, is the question decided in *Ker* v. *Illinois*, 119 U. S. 436 (1886); it is not, however, the question presented for decision today.

The importance of the distinction between a court's exercise of jurisdiction over either a person or property that has been wrongfully seized by a private citizen, or even by a state law enforcement agent, on the one hand, and the attempted exercise of jurisdiction predicated on a seizure by federal officers acting beyond the authority conferred by treaty, on the other hand, is explained by Justice Brandeis in his opinion for the Court in *Cook* v. *United States*, 288 U. S. 102 (1933). That case involved a construction of a Prohibition Era treaty with Great Britain that authorized American agents to board certain British vessels to ascertain whether they were engaged in importing alcoholic beverages. A

---

the individual who has been a victim of this country's breach of an extradition treaty and who wishes to assert the rights of that country in our courts after that country has already registered its protest.

[27] "In the international legal order, treaties are concluded by states against a background of customary international law. Norms of customary international law specify the circumstances in which the failure of one party to fulfill its treaty obligations will permit the other to rescind the treaty, retaliate, or take other steps." Vázquez, Treaty-Based Rights and Remedies of Individuals, 92 Colum. L. Rev. 1082, 1157 (1992).

British vessel was boarded 11½ miles off the coast of Massachusetts, found to be carrying unmanifested alcoholic beverages, and taken into port. The Collector of Customs assessed a penalty which he attempted to collect by means of libels against both the cargo and the seized vessel.

The Court held that the seizure was not authorized by the treaty because it occurred more than 10 miles off shore.[28] The Government argued that the illegality of the seizure was immaterial because, as in *Ker*, the court's jurisdiction was supported by possession even if the seizure was wrongful. Justice Brandeis acknowledged that the argument would succeed if the seizure had been made by a private party without authority to act for the Government, but that a different rule prevails when the Government itself lacks the power to seize. Relying on *Rauscher*, and distinguishing *Ker*, he explained:

> "*Fourth.* As the Mazel Tov was seized without warrant of law, the libels were properly dismissed. The Government contends that the alleged illegality of the seizure is immaterial. It argues that the facts proved show a violation of our law for which the penalty of forfeiture is prescribed; that the United States may, by filing a libel for forfeiture, ratify what otherwise would have been an illegal seizure; that the seized vessel having been brought into the Port of Providence, the federal court for Rhode Island acquired jurisdiction; and that, moreover, the claimant by answering to the merits waived any right to object to enforcement of the penalties. The argument rests upon misconceptions.
>
> "It is true that where the United States, having possession of property, files a libel to enforce a forfeiture resulting from a violation of its laws, the fact that the possession was acquired by a wrongful act is immaterial.

---

[28] The treaty provided that the boarding rights could not be exercised at a greater distance from the coast than the vessel could traverse in one hour, and the seized vessel's speed did not exceed 10 miles an hour. *Cook v. United States*, 288 U. S., at 107, 110.

*Dodge* v. *United States*, 272 U. S. 530, 532 [(1926)]. Compare *Ker* v. *Illinois*, 119 U. S. 436, 444. The doctrine rests primarily upon the common-law rules that any person may, at his peril, seize property which has become forfeited to, or forfeitable by, the Government; and that proceedings by the Government to enforce a forfeiture ratify a seizure made by one without authority, since ratification is equivalent to antecedent delegation of authority to seize. *Gelston* v. *Hoyt*, 3 Wheat. 246, 310 [(1818)]; *Taylor* v. *United States*, 3 How. 197, 205–206 [(1845)]. The doctrine is not applicable here. The objection to the seizure is not that it was wrongful merely because made by one upon whom the Government had not conferred authority to seize at the place where the seizure was made. The objection is that the Government itself lacked power to seize, since by the Treaty it had imposed a territorial limitation upon its own authority. The Treaty fixes the conditions under which a 'vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with' the applicable laws. Thereby, Great Britain agreed that adjudication may follow a rightful seizure. Our Government, lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws. To hold that adjudication may follow a wrongful seizure would go far to nullify the purpose and effect of the Treaty. Compare *United States* v. *Rauscher*, 119 U. S. 407." *Cook* v. *United States*, 288 U. S., at 120–122.

The same reasoning was employed by Justice Miller to explain why the holding in *Rauscher* did not apply to the *Ker* case. The arresting officer in *Ker* did not pretend to be acting in any official capacity when he kidnaped Ker. As Justice Miller noted, "the facts show that it was a clear case of kidnapping within the dominions of Peru, without any pretence of authority under the treaty *or from the government*

*of the United States." Ker* v. *Illinois,* 119 U. S., at 443 (emphasis added).[29] The exact opposite is true in this case, as it was in *Cook.*[30]

The Court's failure to differentiate between private abductions and official invasions of another sovereign's territory also accounts for its misplaced reliance on the 1935 proposal made by the Advisory Committee on Research in International Law. See *ante,* at 665–666, and n. 13. As the text of that proposal plainly states, it would have rejected the rule of the *Ker* case.[31] The failure to adopt that recommendation does not speak to the issue the Court decides today. The

---

[29] As the Illinois Supreme Court described the action:

"The arrest and detention of [Ker] was not by any authority of the general government, and no obligation is implied on the part of the Federal or any State government . . . . The invasion of the sovereignty of Peru, if any wrong was done, was by individuals, perhaps some of them owing no allegiance to the United States, and not by the Federal government." *Ker* v. *Illinois,* 110 Ill. 627, 643 (1884).

[30] The Martinez incident discussed by the Court, see *ante,* at 665, n. 11, also involved an abduction by a private party; the reference to the *Ker* precedent was therefore appropriate in that case. On the other hand, the letter written by Secretary of State Blaine to the Governor of Texas in 1881 unequivocally disapproved of abductions by either party to an extradition treaty. In 1984, Secretary of State Schultz expressed the same opinion about an authorized kidnaping of a Canadian national. He remarked that, in view of the extradition treaty between the United States and Canada, it was understandable that Canada was "outraged" by the kidnaping and considered it to be "a violation of the treaty and of international law, as well as an affront to its sovereignty." See Leich, Contemporary Practice of the United States Relating to International Law, 78 Am. J. Int'l L. 200, 208 (1984).

[31] Article 16 of the draft provides:

"In exercising jurisdiction under this Convention, no State shall prosecute or punish any person who has been brought within its territory or a place subject to its authority by recourse to measures in violation of international law or international convention without first obtaining the consent of the State or States whose rights have been violated by such measures." Harvard Research in International Law, Draft Convention on Jurisdiction with Respect to Crime, 29 Am. J. Int'l L. 435, 623 (Supp. 1935).

Court's admittedly "shocking" disdain for customary and conventional international law principles, see *ante*, at 669, is thus entirely unsupported by case law and commentary.

## IV

As the Court observes at the outset of its opinion, there is reason to believe that respondent participated in an especially brutal murder of an American law enforcement agent. That fact, if true, may explain the Executive's intense interest in punishing respondent in our courts.[32] Such an explanation, however, provides no justification for disregarding the Rule of Law that this Court has a duty to uphold.[33] That the Executive may wish to reinterpret[34] the Treaty to

---

[32] See, *e. g.*, Storm Arises Over Camarena; U. S. Wants Harder Line Adopted, Latin Am. Weekly Rep., Mar. 8, 1985, p. 10; U. S. Presses Mexico To Find Agent, Chicago Tribune, Feb. 20, 1985, p. 10.

[33] As Justice Brandeis so wisely urged:

"In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (dissenting opinion).

[34] Certainly, the Executive's view has changed over time. At one point, the Office of Legal Counsel advised the administration that such seizures were contrary to international law because they compromised the territorial integrity of the other nation and were only to be undertaken with the consent of that nation. 4B Op. Off. Legal Counsel 549, 556 (1980). More recently, that opinion was revised, and the new opinion concluded that the President did have the authority to override customary international law. Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 101st Cong., 1st Sess., 4–5 (1989) (statement of William P. Barr, Assistant Attorney General, Office of Legal Counsel, U. S. Department of Justice).

allow for an action that the Treaty in no way authorizes should not influence this Court's interpretation.[35]   Indeed, the desire for revenge exerts "a kind of hydraulic pressure . . . before which even well settled principles of law will bend," *Northern Securities Co.* v. *United States,* 193 U. S. 197, 401 (1904) (Holmes, J., dissenting), but it is precisely at such moments that we should remember and be guided by our duty "to render judgment evenly and dispassionately according to law, as each is given understanding to ascertain and apply it."   *United States* v. *Mine Workers,* 330 U. S. 258, 342 (1947) (Rutledge, J., dissenting).   The way that we perform that duty in a case of this kind sets an example that other tribunals in other countries are sure to emulate.

The significance of this Court's precedents is illustrated by a recent decision of the Court of Appeal of the Republic of South Africa.   Based largely on its understanding of the import of this Court's cases—including our decision in *Ker*— that court held that the prosecution of a defendant kidnaped by agents of South Africa in another country must be dismissed.   *S* v. *Ebrahim,* S. Afr. L. Rep. (Apr.–June 1991).[36] The Court of Appeal of South Africa—indeed, I suspect most courts throughout the civilized world—will be deeply disturbed by the "monstrous" decision the Court announces today.   For every nation that has an interest in preserving the Rule of Law is affected, directly or indirectly, by a deci-

---

[35] Cf. *Perkins* v. *Elg,* 307 U. S. 325 (1939) (construing treaty in accordance with historical construction and refusing to defer to change in Executive policy); *Johnson* v. *Browne,* 205 U. S. 309 (1907) (rejecting Executive's interpretation).

[36] The South African court agreed with appellant that an "abduction represents a violation of the applicable rules of international law, that these rules are part of [South African] law, and that this violation of the law deprives the Court . . . of its competence to hear [appellant's] case . . . ." S. Afr. L. Rep., at 8–9.

sion of this character.[37]   As Thomas Paine warned, an "avidity to punish is always dangerous to liberty" because it leads a nation "to stretch, to misinterpret, and to misapply even the best of laws."[38]   To counter that tendency, he reminds us:

> "He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself."[39]

I respectfully dissent.

---

[37] As Judge Mansfield presciently observed in a case not unlike the one before us today: "Society is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law." *United States* v. *Toscanino,* 500 F. 2d 267, 274 (CA2 1974).

[38] 2 The Complete Writings of Thomas Paine 588 (P. Foner ed. 1945).

[39] *Ibid.*