Argued and submitted August 6, 2008, affirmed May 13, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# DENIZ CINAR AYDINER,
*Defendant-Appellant.*

Multnomah County Circuit Court
040130321; A132546

208 P3d 515

Stephen A. Houze argued the cause and filed the brief for appellant.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Defendant, a Turkish citizen, appeals a judgment of conviction for, among other things, 10 counts of aggravated murder. His primary argument on appeal is that the use of "trickery and deceit" by law enforcement authorities to secure his presence in the United States to face criminal prosecution violated this country's extradition treaty with Turkey. Accordingly, he argues, the trial court lacked personal jurisdiction and, thus, his convictions are unlawful. We affirm.

The relevant facts are undisputed. Defendant's crimes stemmed from the murder of a student at the University of Portland in 2001. In 2003, while the investigation was pending, defendant left Oregon and returned to Turkey. Meanwhile, investigators matched DNA that they had obtained from defendant before his departure with evidence from the crime scene; defendant had no knowledge of that development in the investigation, however.

The state indicted defendant, alleging 11 counts of aggravated murder; one count each of kidnapping in the second degree, sexual abuse in the first degree, and attempted rape in the first degree; two counts of sodomy in the first degree; and four counts of burglary in the first degree. The state planned to seek the death penalty. At that point, defendant was still in Turkey and was unaware that he had been charged in connection with the murder.

Defendant wanted to return to Oregon to be with his wife, who is a United States citizen. Because he had overstayed his prior visit, he was denied reentry. The applicable immigration laws prevented him from returning to the United States without a waiver of those laws. The state, having learned that defendant was in Turkey and attempting to return to this country, requested that the federal government permit him to do so in order to facilitate his arrest. Believing that he had been granted the necessary waiver, defendant purchased an airline ticket and flew back to the United States. When he arrived at the Portland International Airport in January 2004, he was immediately arrested.

At no point before his return to this country was defendant aware of the charges against him. The United States authorities never notified Turkey that it sought defendant for criminal prosecution. Nor did they ever request extradition pursuant to the extradition treaty between the United States and Turkey. It is undisputed that Turkey would not have extradited defendant to be prosecuted for a capital offense.

Defendant moved to dismiss the charges against him, asserting that the court lacked personal jurisdiction. That is so, he argued, because the government's "overarching scheme of trickery and deceit employed to bypass the treaty requirements" violated the extradition treaty, which he contended is the exclusive means by which authorities could secure his presence in this country for a criminal prosecution. Defendant also issued several subpoenas *duces tecum*, seeking testimony and documents from various City of Portland and federal law enforcement employees at an evidentiary hearing pertaining to the details as to how they tricked him into returning to the United States. He acknowledged that he did not know what documents or testimony those witnesses could provide.

The city and the United States moved to quash the subpoenas and opposed defendant's request for an evidentiary hearing on his motion to dismiss. The state also opposed defendant's request for a hearing, filing a motion *in limine* to exclude any testimony or production of documents by any of the subpoenaed individuals. In general, the governmental entities argued that such testimony was unnecessary because the prosecution had stipulated to the facts that they deceived defendant about his immigration status and tricked him into returning to the United States. Such actions, they argued, do not violate the extradition treaty, because they are not required to comply with the terms of the treaty unless there is an actual request for extradition. In their view, mere trickery does not constitute a treaty violation.

The trial court quashed the subpoenas and granted the state's motion *in limine*. The court also declined to hold an evidentiary hearing on defendant's motion to dismiss, which the court denied. In its order denying the motion, the

court made numerous factual findings, including that defendant "ha[d] been deceived by the government into thinking that his efforts to obtain a lawful visa had been successful." Defendant filed a motion to reconsider based on a new argument that the government's trickery and deceit violated his rights to due process, thus warranting dismissal of the charges against him. The court also denied that motion.

During the course of the prosecution, several charges were dismissed, and defendant pleaded no contest to the remaining charges. He was ultimately convicted of 10 counts of aggravated murder, one count each of sexual abuse in the first degree and attempted rape in the first degree, two counts of sodomy in the first degree, and four counts of burglary in the first degree.[1]

On appeal, defendant assigns error to the aforementioned pretrial rulings and urges this court to vacate his judgment of conviction. Regarding the court's denial of his motion to dismiss, he renews his argument that the government's actions violated the extradition treaty between the United States and Turkey because extradition is the only means by which defendant could be brought back to this country to face criminal prosecution. Regarding the denial of his motion to reconsider, defendant argues that, even if the government's actions did not violate the extradition treaty, they deprived him of due process. Defendant also challenges the court's decisions to quash the subpoenas and exclude witness testimony at an evidentiary hearing, and requests that we remand the case for such a hearing.

We begin with defendant's assertion that the extradition treaty between the United States and Turkey provides the exclusive means by which the state could secure his presence for criminal prosecution. In construing a treaty, we look first to its terms to determine its meaning as intended by the signatories. *Air France v. Saks*, 470 US 392, 396-97, 105 S Ct 1338, 84 L Ed 2d 289 (1985). If the treaty's wording is clear,

---

[1] Before sentencing, the parties stipulated that defendant's 10 counts of aggravated murder would merge into a single conviction. *See State v. Barrett*, 331 Or 27, 10 P3d 901 (2000). Notwithstanding that stipulation, the judgment states only that the convictions merge "for purpose of sentencing." Because defendant does not assign error to that aspect of the judgment, we do not address it.

resort to drafting history to ascertain its meaning is not appropriate. *Chan v. Korean Air Lines, Ltd.*, 490 US 122, 134, 134 n 5, 109 S Ct 1676, 104 L Ed 2d 113 (1989).

Chapter I, Section I, Article 1, of the treaty at issue in this case—which was signed by President Jimmy Carter and ratified by the United States Senate in 1979—provides, in part:

> "(1) The Contracting Parties undertake to surrender to each other, in accordance with the provisions and conditions laid down in this Treaty, *all persons who are found within the territory of the Requested Party and who are being prosecuted for or have been charged with an offense,* or convicted of an offense, or are sought by the other Party for the enforcement of a judicially pronounced penalty for an offense committed within the territory of the Requesting Party."

(Emphasis added.)

According to defendant, the text of that provision—especially the italicized portion—makes clear the "exclusive character" of the extradition treaty. Relying on the inclusion of the phrases "all persons" and "found within the territory," he argues that, because he "squarely falls within the scope" of the relevant treaty provision, the United States was required to seek extradition and its failure to do so violated the treaty. Defendant asserts that, because "the prosecutorial machinations in the case at bar were precisely an intentional refusal to cooperate with Turkish authorities on this extraordinarily serious criminal matter," the trial court lacked personal jurisdiction because he was brought into the United States in violation of the treaty. According to defendant, the treaty "was intended to provide the sole vehicle for transferring individuals accused of crime between the United States and Turkey." As a result, defendant argues, failing to invoke the extradition process is itself a violation of the treaty.

The state responds that nothing in the treaty prohibits it from obtaining defendant's return to this country through means outside of the extradition process. According to the state, the treaty regulates the process of extradition and, in the event that a signatory makes such a request, governs the manner in which extradition occurs. The state

points to the limiting language of the text, in that it uses the phrases "Requested Party" and "Requesting Party," which, by definition, require that an extradition request has been made. Accordingly, the state asserts, "because the United States made no effort to invoke the Extradition Treaty to obtain defendant's presence in this count[r]y, no treaty violation could have occurred." Further, the state argues that this case is controlled by precedent from the United States Supreme Court, *United States v. Alvarez-Machain*, 504 US 655, 112 S Ct 2188, 119 L Ed 2d 441 (1992).

The defendant in *Alvarez-Machain*—a Mexican national—argued that, when the federal government forcibly kidnapped him in Mexico and brought him to the United States, those actions violated the extradition treaty between Mexico and the United States. As a result, the defendant asserted, the court had no personal jurisdiction and, thus, he could not be criminally prosecuted in the United States. 504 US at 657-58. The Court held that the treaty "does not purport to specify the *only way* in which one country may gain custody of a national of the other country for the purposes of prosecution." *Id.* at 664, 664-65 (emphasis added) (stating further that the treaty "establish[es] the procedures to be followed when the Treaty is invoked"). The Court further concluded:

> "In sum, to infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice. * * * [T]o imply from the terms of this Treaty that it prohibits obtaining the presence of an individual by means outside of the procedures the Treaty establishes requires a * * * large[ ] inferential leap, with only the most general of international law principles to support it. The general principles cited by [the defendant] simply fail to persuade us that we should imply in the United States-Mexico Extradition Treaty a term prohibiting international abductions."

*Id.* at 668-69.

Defendant acknowledges that, in *Alvarez-Machain*, the Court came to the opposite result from that for which he advocates in this case. *Alvarez-Machain* is distinguishable from this case, defendant asserts, because the extradition

treaty is worded differently. In any event, defendant contends that *Alvarez-Machain* was wrongly decided.

Based on the text of Article 1, we agree with the state that the signatories to the treaty did not intend the extradition process to be exclusive. Of particular importance, as the state points out, is the inclusion of the phrases "Requested Party" and "Requesting Party"; without an extradition request, one would not even know to which signatory the obligations apply. The treaty also contains no express prohibition against obtaining a person's presence by any other means, including trickery or deceit. To the extent that defendant urges us to read into the treaty such an implied prohibition, we reject that contention as well. Given that the United States Supreme Court declined to read a prohibition on forcible kidnapping into a similarly worded extradition treaty in *Alvarez-Machain*—and concluded that general principles of international law did not require such a prohibition to be implied—we do not understand how a different result could obtain relating to much less intrusive governmental conduct.

The trial court did not err in denying defendant's motion to dismiss for lack of personal jurisdiction on the ground of a violation of the extradition treaty. Because we conclude that no violation occurred, we need not address defendant's assertion that the treaty conferred on him individually enforceable rights that warrant dismissal of the charges against him as the appropriate remedy.

We turn then to defendant's assertion that, nevertheless, the trial court should have dismissed the charges against him on reconsideration. According to defendant, the government's conduct in this case violated his rights pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The state disagrees, asserting that concealing from defendant the fact of the criminal prosecution and allowing him to believe that he had been granted a waiver of the applicable immigration laws did not violate his due process rights.

Again, we agree with the state, finding the United States Supreme Court's decision in *Alvarez-Machain* to be particularly instructive in this regard, as well. In that case,

once the Court concluded that the defendant's abduction did not violate the relevant extradition treaty, the Court similarly concluded that the abduction did not violate his right to due process. *See* 504 US at 661, 670 (" '[S]uch forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court.' " (quoting *Ker v. Illinois*, 119 US 436, 444, 7 S Ct 225, 30 L Ed 421 (1886))). In this case, because we have concluded that no violation of the treaty occurred, we "need not inquire as to how [defendant] came before [the court]." *See Alvarez-Machain*, 504 US at 662.

■    Defendant's final three assignments of error relate to the trial court's rulings quashing defendant's subpoenas and excluding the testimony of witnesses at an evidentiary hearing on his motion to dismiss. Defendant argues that he was entitled to present specific facts and details as to how he was tricked and deceived.

The state responds that any such evidence would have been cumulative because the state stipulated that it had intentionally deceived defendant in order to get him to return to the United States—and, in fact, the trial court made a finding to that effect. Furthermore, the state asserts, the trial court ruled properly because defendant admitted that he did not know what the particulars of the testimony might be.

The trial court did not err. The details of the government's conduct beyond the stipulation that local and federal government employees deliberately tricked defendant are irrelevant and would have no impact on our foregoing analysis of whether he was entitled to dismissal of the charges against him.

Affirmed.