# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 20, 2008

## STATE OF TENNESSEE v. GENARO EDGAR ESPINOSA DORANTES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-D-3184     Steve R. Dozier, Judge**

**No. M2007-01918-CCA-R3-CD - Filed November 30, 2009**

Defendant-Appellant, Genaro Edgar Espinosa Dorantes ("Dorantes") was convicted by a Davidson County jury of first degree felony murder during the perpetration of aggravated child abuse and aggravated child abuse by infliction of injury. For the felony murder conviction, Dorantes received a mandatory sentence of life imprisonment. The trial court later sentenced him as Range I, standard offender to a consecutive term of twenty-two years' incarceration for the aggravated child abuse conviction. Dorantes argues: (1) the record is insufficient to support both his conviction for first degree felony murder based on aggravated child abuse and his conviction for aggravated child abuse; (2) the trial court erred in admitting certain photographs of the victim's body; (3) the trial court erred when it refused to provide a special jury instruction that ensured that the verdicts were based on acts of abuse rather than a continuing course of neglect; (4) the trial court erred in denying his motion to require the State to make an election of offenses; and (5) his sentence of twenty-two years for the aggravated child abuse conviction was excessive. After a careful review of the record and the issues presented, we conclude the evidence is insufficient to support the aggravated child abuse conviction; therefore, we reverse and vacate the conviction for the aggravated child abuse and modify Dorantes' sentence to life imprisonment. The judgment of the trial court for the felony murder conviction is affirmed**.**

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed In Part and Reversed In Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOSEPH M. TIPTON, P.J., filed a concurring and dissenting opinion.

Jeffrey A. DeVasher, Assistant Public Defender (on appeal); Ross E. Alderman, District Public Defender (at trial) and Amy D. Harwell, Assistant Public Defender (at trial), Nashville, Tennessee, for the Defendant-Appellant, Genaro Edgar Espinosa Dorantes.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin N. Miller and Brian K. Holmgren, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On June 27, 2003, Dorantes and Martha L. Patlan-Cano ("Patlan") were indicted as co-defendants by the Davidson County Grand Jury and charged with first degree felony murder during the perpetration of aggravated child abuse (count one) and aggravated child abuse (count two). After extradition from Mexico, Dorantes and Patlan were also charged in a superseding indictment with first degree felony murder during the perpetration of aggravated child neglect (count three) and aggravated child neglect (count four). Dorantes moved to dismiss the additional counts in the superseding indictment because they were not part of the terms in the extradition agreement between the United States and Mexico pursuant to their extradition treaty. Under the Doctrine of Specialty, Dorantes maintained the State could not detain, try, or punish him for any offenses not listed in the agreement. See, e.g, United State v. Alvarez-Machain, 504 U.S. 655, 659-60 (1992). The State did not oppose the motion, and the trial court dismissed counts three and four. Dorantes was convicted as charged by the jury and received a mandatory life sentence for the felony murder during the perpetration of aggravated child abuse conviction and a consecutive twenty-two-year sentence for the aggravated child abuse conviction.

**Trial.** On the morning of February 23, 2003, the body of a four-year-old child was found in a park in Nashville, Tennessee. After being alerted by a jogger in the park, Officer Jerry Moore with the Metropolitan Park Police located the child's body behind an earthen mound between 8:30 a.m. and 8:45 a.m. Officer Moore drove to the area, secured the scene, and called for a detective on his radio. The body was later identified as Luis Cisneros, the victim in this case.

Jose Luis Cisneros Servantes ("Jose"),[1] Patlan's husband, testified that he and the co-defendant, along with their other three children, lived in Mexico when the victim was born. After Jose and the co-defendant separated, Jose left the children with his wife and moved to Houston, Texas. In 2001, Jose took the children from Mexico and moved them to Texas with him. In June 2002, while the victim was at Jose's home in Texas, the victim "went missing." Jose never saw his son alive again. Jose stated that the victim was physically "one hundred percent normal and healthy," did not have any mental difficulties, and did not wear diapers before he disappeared. Jose identified a photograph of the victim taken prior to his death which was admitted into evidence.

---

[1] Due to several witnesses having similar names, some of the witnesses will be referred to by their first or middle name. No disrespect is intended by this format.

On cross-examination by Patlan's counsel,[2] Jose testified that he went to Nashville to search for the victim approximately two months after he disappeared. Jose stated that the children were originally with his wife in Mexico before they moved to Houston with him.

Martha Bernece Cisneros Patlan ("Bernece"), Patlan's and Jose's oldest child, testified that she was present when Patlan took the victim from their father's residence in Texas. Bernece stated that Dorantes was with Patlan at the time the victim was taken. She saw Patlan put the victim in a black car, which was the last time she had seen the victim alive. Bernece identified both Patlan and Dorantes in open court at trial.

On cross-examination by Dorantes' counsel, Bernece testified that she did not know Dorantes' identity at the time the victim was taken. Bernece was only able to identify Dorantes after she saw photographs of Dorantes on the news and learned of the victim's death several months later.

Antonia Patlan ("Antonia"), Patlan's sister, testified that in February of 2003, Patlan came to her apartment in Nashville and asked for money. Patlan told her that she needed the money "to buy a cream because [the victim] had been burned." Patlan told Antonia that the victim "had burned himself with some corn cobs that she was cooking." Antonia gave Patlan forty dollars to buy the medicine. A week later, Patlan returned to Antonia's apartment to store some items and told Antonia that she was going on a trip. Antonia then asked to see the victim, who was waiting inside a white van driven by Dorantes. Upon seeing the victim, Antonia touched his head and asked "what happened to you, my child?" She was unable to understand the victim's response. Antonia stated that the victim appeared to be sitting "in a position like maybe not to hurt himself," protecting his buttock area. Dorantes then said, "'Let's go, let's go woman, let's go, woman.'" Antonia stated that she could not distinguish the color of the victim's clothes at the time because it was dark outside. She only remembered that he was fully clothed in dark clothing and did not see his feet.

On cross-examination by Dorantes' counsel, Antonia testified that Patlan and her family traveled frequently and never rented an apartment or stayed in one place. On cross-examination by Patlan's counsel, Antonia testified that Patlan seemed concerned and worried when she asked for the money to buy the medicine for the victim and that Dorantes was in a hurry to leave for the trip.

Maria Patlan-Cano ("Maria"), Patlan's other sister, testified that she observed the victim's appearance while he was in Mexico and in Nashville. While in Mexico, the victim was "chubbier" and "very happy." When Maria saw him in Nashville, the victim was "very thin and very crestfallen." Maria stated that on February 20, 2003, Patlan came to her job crying and asking for money because the victim was very sick and needed medicine. Maria stated that Patlan told her that

---

[2] Although Genaro Dorantes and Martha L. Patlan-Cano were tried together, this appeal relates only to Dorantes.

the victim had been burned from corn on the cob and that she was very afraid that he was going to die. Maria went outside and asked to see the victim, who was inside a white van driven by Dorantes. Dorantes declined her request, stating that he had to move the van because he was blocking traffic. After Dorantes moved the van away from traffic, Maria went into the van. Upon entry, she screamed "why was the child like this, why was the child like that?" Maria stated that the victim did not move when she called his name. She noticed that the victim was "very skinny" and that his foot was bandaged. Patlan then told Maria to leave the vehicle because Dorantes was angry. While Patlan was crying, Dorantes told Patlan to get in the van. As Maria was getting out of the van, the van began to move. Maria stated that she was able to get the license plate number of the van to give to the police. In a photograph taken of the victim at the park, Maria identified the victim's body and stated that he was wearing the same clothes when she saw him on February 20, 2003.

On cross-examination by Patlan's counsel, Maria testified that Patlan was scared when Dorantes became angry at her. She stated that Dorantes asked her (Maria) to leave the van when she was asking questions about the victim.

Maria was recalled to testify by the State. She testified that she asked Dorantes why he did not give the victim any medicine or take the victim to the doctor. Dorantes replied that "since he wasn't [the victim's] father he didn't have any reason to want to make [the victim] get better." Maria then asked Dorantes why he took the victim away from his father. Dorantes said that "he didn't want to bring [the victim] but that [expletive referring to Patlan] wanted it to happen."

On cross-examination by Dorantes' counsel, Maria acknowledged that she did not mention the above conversation with Dorantes in her sworn affidavit.

Juan Sanchez ("Juan"), Maria's brother-in-law, testified that Maria asked him to call the police after her encounter with Dorantes and Patlan. Juan also officially identified the victim's body when it was found in the park.

Keith Sutherland, a detective with the Metropolitan Nashville Police Department, testified that fugitive extradition warrants were issued for Dorantes and Patlan. Detective Sutherland stated that he assisted in transporting Dorantes and Patlan from Mexico back to Nashville.

Sara Bruner, a detective with the Youth Services Division of the Metropolitan Nashville Police Department, testified that she was assigned to investigate the victim's death. She received a report taken by patrol officers that some children were "in poor condition" and "in a state of shock". On February 21, 2003, as part of Det. Bruner's investigation, she telephoned Juan Sanchez whose number was listed in the report. Based on her conversation with Sanchez, Det. Bruner issued a notice to other police officers to be on the look out for the van Dorantes and Patlan were driving.

Days later, Det. Bruner learned that the victim was found dead in a park. She stated that Dorantes and Patlan were the only suspects in the case. In 2006, Det. Bruner learned that Patlan was in Mexico.

Brad Corcoran, a detective with the Homicide Division of the Metropolitan Nashville Police Department, testified that he responded to a call that a child's body was found in West Park. Detective Corcoran stated that the victim's body "appeared [as though] it had been placed [in the park] rather than [having] walked there" because the victim did not have any debris on the bottom of his socks and there was no debris or vegetation around the victim that had been moved. He noticed that the body was fully clothed except for shoes or a jacket. Detective Corcoran stated that the body was behind a dirt mound and would not have been seen by anyone from the road or the park's parking lot. Detective Corcoran concluded that the body had not been there long because it had snowed the night before, and no snow was present on the body. There were also several people present in the park on the previous day. On February 24, 2003, Dorantes and Patlan were named as suspects, and warrants were issued for their arrest. After approximately three years of media coverage and tips, Dorantes and Patlan were arrested in Mexico and brought back to Nashville.

Carla Aaron with the Department of Children's Services testified that all caregivers are responsible for providing proper nutrition, medical treatment, and a safe environment for a child. After becoming aware of the victim's death, Aaron inquired about past complaints involving the victim and his siblings, but none were found. She testified that if a medical provider had seen the victim's condition, the provider should have reported it to the Department of Children's Services.

Amy R. McMaster, the Deputy Chief Medical Examiner for Davidson County and a practicing physician, testified that on February 24, 2003, she performed an autopsy of the victim's body. Dr. McMaster outlined the injuries sustained by the victim that were consistent with child abuse. The external examination of the victim revealed "multiple injuries of varied ages over virtually every surface of [the victim's] body." The victim had bandages wrapped around his feet and was wearing a diaper. Dr. McMaster concluded that the diaper was used to absorb blood caused by scabbing over burns that were on his buttocks and genitals. She explained the victim had sustained extensive burn injuries to his feet, buttocks, scrotum, and penis. The burn injuries were consistent with the victim having been intentionally placed in water over 150 degrees by an adult caregiver. She stated that the burns were inconsistent with injuries caused by cooking corn cobs. The burns to the victim's feet would have prevented him from walking and the burns to his buttocks would have prevented him from sitting comfortably. The burns were from a couple of days to a couple of weeks old. Dr. McMaster stated that the victim had sustained scars on his face and multiple bruises and puncture wounds on other areas of his body. The puncture wounds were consistent with having been poked with "some type of pointed instrument." The injuries on the skin were at different stages of healing.

Examination of the victim's internal injuries revealed that he had sustained blunt trauma to his brain and skull. Changes to his organs "suggested [that] he had an infection throughout his

-5-

body." Dr. McMaster stated that the victim had "fluid that accumulated in different body spaces, which could indicate that because of the infection or for other reasons his organs began to fail," and that he would have died from the infection. Dr. McMaster stated that the most significant injury to the victim was the blunt force trauma to his head consisting of an abrasion on a portion of his left ear, a skull fracture, and bleeding around the brain caused by something striking his head. The swelling of the victim's brain indicated that the brain injuries were more recently sustained. Dr. McMaster stated that the victim likely died within "a couple of hours after the head injury was inflicted." She opined that the blunt force head trauma was "non-accidental." She reasoned that the victim "was not able to get up and walk around, interact with his surroundings. [The victim] basically, from his burns, would have been immobile. He would have been . . . lying [sic] in one place. So there's really no mechanism for him getting this blunt trauma to his head unless it's inflicted by another individual." She further opined that bruises found on the victim's right hand possibly indicated that he attempted to protect his head or other body parts from the blunt force trauma. Dr. McMaster also discovered an old contusion on the right side of the victim's brain, indicating that he had previously sustained blunt force head trauma.

In order to assist the medical examiner in explaining the autopsy, the following photographs of the victim's body illustrating his injuries were admitted into evidence and displayed to the jury: (1) a photograph of the victim's lower back, Exhibit No. 7-E; (2) a photograph of the burns on the victim's back, buttocks, right hand, and elbow, Exhibit No. 7-O; (3) a photograph of the burns on the victim's buttocks, legs, and feet, Exhibit No. 7-P; (4) a photograph of the burns on the victim's legs and feet, Exhibit No. 7-J; (5) a photograph of the burns on the victim's right leg and foot, Exhibit No. 7-N; (6) a photograph of the burns on the bottom of the victim's left foot, Exhibit No. 7-X; and (7) a photograph of the injury to the victim's elbow, Exhibit No. 7-R.

Dr. McMaster also testified that the victim's injuries indicated that he had been physically neglected. She stated that the victim had untreated, infected burns on his body, and the bacteria from these infections had spread throughout his body. She also stated that the victim was "very thin" and "malnourished. . . . [H]is ribs were very easily seen beneath his skin." At the time of the victim's death, he weighed thirty-four pounds with "just a little bit of thick fluid" in his stomach. Dr. McMaster did not recall examining the victim's colon or large bowel contents to determine if he had recently eaten. Despite the victim's blunt trauma to his head, Dr. McMaster stated the victim would have died if the infections from the burns remained untreated. Based on the combination of these injuries, Dr. McMaster concluded the victim's cause of death was Battered Child Syndrome, "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse." The term is also used to characterize injuries involving neglect. Dr. McMaster stated that the manner of the victim's death was homicide.

Neither Dorantes nor Patlan presented any proof at trial.

At the conclusion of the trial, the jury found Dorantes guilty of first degree felony murder and aggravated child abuse. The trial court imposed a mandatory life sentence for the first degree murder conviction and set a date for a sentencing hearing for the aggravated assault conviction.

**Sentencing Hearing.** At the sentencing hearing, the presentence report was admitted into evidence, which showed that Dorantes had been previously convicted in Texas for misdemeanor offenses consisting of assault and theft charges. Neither the State nor Dorantes presented any live testimony. Following a detailed review of the evidence presented at trial and the sentencing hearing, the trial court imposed a sentence of twenty-two years at 100% for the aggravated child abuse conviction to be served consecutively to a mandatory life sentence for the first degree felony murder conviction.

## ANALYSIS

**I.  Sufficiency of the Evidence.** Dorantes argues the record is insufficient to support both his convictions for first degree felony murder based on aggravated child abuse and his conviction for aggravated child abuse. He contends that the above convictions were based solely upon circumstantial evidence that does not exclude every reasonable hypothesis except that of his guilt. He claims "while any of the State's theories of guilt are possible, a conviction based on any such theory would be contrary to this Court's decision in State v. Hix, 696 S.W.2d 22, 25 (Tenn. Crim. App. 1994) [overruled on unrelated issue by State v. Messamore, 937 S.W.2d 916, 919 (Tenn.1996).]" He lastly argues the evidence is insufficient as a matter of law to establish beyond a reasonable doubt that he knowingly committed or attempted to treat the victim in such a manner as to inflict injury. The State argues the evidence is sufficient to support the convictions. Because the record is devoid of any proof showing Dorantes inflicted physical injury upon the victim, his conviction for aggravated child abuse must be reversed and vacated. However, we conclude that the evidence was sufficient for the jury to find Dorantes guilty of first degree felony murder by aggravated child abuse through neglect.

Our analysis of the above issue is guided by the well-established rule that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 442 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in cases where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, must determine the weight given to witnesses' testimony, and must

reconcile all conflicts in the evidence. State v. Odom, 923 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

We also recognize that "[i]n the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). In such a case, the evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). In addition, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613. The trier of fact decides the weight to be given to circumstantial evidence, and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable, 313 S.W.2d at 457 (quoting 2 Wharton's Criminal Evidence 1605-06).

We will address the first degree felony murder in the perpetration of aggravated child abuse first. As previously stated, Dorantes was initially indicted for first degree felony murder in the perpetration of aggravated child abuse. Following his extradition from Mexico, the State superseded the indictment and additionally charged Dorantes with first degree felony murder based on aggravated child neglect. By consent from the State, Dorantes' motion to dismiss the felony murder based on child neglect offense in count three was granted because it violated the extradition agreement. The remaining felony murder indictment charged, in count one, that Dorantes "did kill Luis Osvaldo Cisneros (d.o.b. 7/16/98), during the perpetration of or attempt to perpetrate Aggravated Child Abuse, in violation of Tennessee Code Annotated § 39-13-202." Interpreting the indictment as charging felony murder during the perpetration of aggravated child abuse based on serious bodily injury by physical abuse alone, Dorantes contends that the indictment should be dismissed as a matter of law because there was no proof at trial that he was the person who inflicted the victim's fatal injuries. In other words, Dorantes argues the indictment varied fatally from the proof presented at trial. In response, the State emphasizes that the victim was at all pertinent times

in Dorantes' care and that the jury resolved the issue of identity against Dorantes; therefore, the evidence is sufficient to support both of Dorantes' convictions.

Because the law governing child abuse changed between the commission of the offenses charged in this case and Dorantes' trial and sentencing, a discussion of the child abuse and neglect law applicable at the time of the instant offense is necessary. See T.C.A. § 39-11-112 (1997) ("When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense."). Tennessee Code Annotated section 39-13-202, in relevant part, defined first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." T.C.A. § 39-13-202(a)(2) (Supp. 2002). The statute governing aggravated child abuse stated, in relevant part:

> (a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
>
> > (1) The act of abuse or neglect results in serious bodily injury to the child; or
> >
> > (2) A deadly weapon is used to accomplish the act of abuse.

T.C.A. § 39-15-402(a) (Supp. 2002). Finally, Tennessee Code Annotated section 39-15-401(a) (Supp. 2002),[3] the statute governing child abuse and neglect at the time of the instant offense, provided:

---

[3] Effective July 1, 2005 the child abuse and child neglect statute was amended to provide:

> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is six (6) years of age or less, the penalty is a Class D felony.
>
> (b) Any person who knowingly abuses or neglects a child under thirteen (13) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class E felony.

T.C.A. § 39-15-401(a), (b) (Supp. 2005). On June 20, 2006, in Public Acts chapter 939, section 1, the legislature again amended the statute by changing subsection (b) to read:

> Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor . . . .

T.C.A. § 39-15-401(b) (2006).

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

"'Serious bodily injury' means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Id. §-106(a)(2).

In State v. Mateyko, the Tennessee Supreme Court described the above version of the child abuse and neglect statute as "a single offense that may be committed through one of two courses of conduct: child abuse through injury and child abuse through neglect." 53 S.W.3d 666, 668 n.1 (Tenn. 2001); State v. Hodges, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998). Aggravated child abuse is similarly established by either of these methods, plus serious bodily injury to the child. T.C.A. § 39-15-402(a)(1) (Supp. 2002); Hodges, 7 S.W.3d at 622-23; State v. Ducker, 27 S.W.3d 889, 895-96 (Tenn. 2000). More specifically, in Hodges, this court held that the term "child abuse," as charged in an indictment, included child neglect. Hodges, 7 S.W.3d at 622-23. The Hodges court reasoned, "[c]hild abuse as defined in § 39-15-401 encompasses § 39-15-401(a) in its entirety[.]" We have also previously concluded that "the legislature fully intended for aggravated child abuse to include child abuse through neglect that results in serious bodily injury. The language of the statute supports such an interpretation." State v. John and Rita Adams, No. 02C01-9707-CR-00246, 1998 WL 389066, at *4 (Tenn. Crim. App., at Jackson, July 14, 1998), aff'd, 24 S.W.3d 289 (Tenn. June 30, 2000); but see State v. Denise Maupin, No. 272, 1991 WL 197420, at * 5 (Tenn. Crim. App., at Knoxville, Oct. 7, 1991), (stating that child abuse as proscribed in a child abuse murder statute did not include child neglect) aff'd, 859 S.W.2d 313 (Tenn. Aug. 2, 1993).

Based on the above authority, when the term "child neglect" is not expressly included within the indictment, a defendant remains on notice "that he could be convicted for both felony murder with the underlying felony of aggravated child abuse through injury, as well as for the underlying felony of aggravated child abuse through neglect, regardless of whether the jury convict[s] him based on the theory of child abuse or child neglect." State v. Blake Delaney Tallant, No. E2006-02273-CCA-R3-CD, 2008 WL 115818, at *23 (Tenn. Crim. App., at Knoxville, Jan. 14, 2008). Accordingly, Dorantes' fatal variance argument must fail because the indictment under which he was convicted embraced both modes or courses of conduct for the commission of child abuse. See also T.C.A. § 40-13-206 (1997) ("When the offense may be committed by different forms, by different means or with different intents, the forms, means or intents may be alleged in the same count in the alternative.").

In light of the above conclusion, we must now determine whether the evidence is sufficient for a jury to find Dorantes guilty of felony murder based on aggravated child abuse through infliction of physical injury or felony murder based on aggravated child abuse through neglect, and aggravated child abuse. First, we agree with Dorantes and conclude that his convictions for felony murder based on a theory of child abuse through infliction of injury and aggravated child abuse cannot be sustained. Unlike the felony murder count in the indictment, the aggravated child abuse count expressly provided that Dorantes "did knowingly, other than by accidental means, treat [the victim], a child six (6) years of age or less in such a manner as to inflict injury[.]" Our review of the record shows that the State never argued that Dorantes inflicted the victim's fatal injuries and did not offer any proof in support of this theory. Although poorly articulated, the State argued throughout trial and during closing argument that Dorantes failed to provide the victim with necessary medical treatment. Accordingly, the conviction for felony murder based on a theory of aggravated child abuse through infliction of injury and the conviction for aggravated child abuse are not supported by the proof in this case. As such, the aggravated child abuse conviction must be reversed and vacated.

With the above conclusion, State v. Hix becomes inapplicable. It is important to note that the defendants in Hix were convicted of one count of assault and battery and one count of child abuse.[4] Rather than evidence showing abuse by neglect, the only proof presented by the State in Hix supported a theory that either or both of the defendants committed the abuse by inflicting injuries upon the child. In reversing, this court held that because the defendants' convictions were based upon circumstantial evidence alone, the evidence was insufficient to prove beyond a reasonable doubt which defendant committed the offense; that is, inflicted the injuries upon the child. In contrast, the proof presented in this case showed that the co-defendant was responsible for inflicting the burn injuries upon the child. Accordingly, the holding in Hix does not apply because the evidence presented by the State against Dorantes supported a theory of abuse based on neglect. As such, Dorantes is not entitled to relief on this issue.

---

[4] Tennessee Code Annotated Section 39-4-401(a) (1982) [repealed 1989, replaced by T.C.A. § 39-15-401(a) (Supp.1989) ] provided:

> (a)Any person who maliciously, purposely, or knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such manner as to inflict injury or neglects such a child so as to adversely affect its health and welfare is guilty of a misdemeanor and upon conviction may be fined not more than one thousand dollars ($1,000) or imprisoned for not more than eleven (11) months and twenty-nine (29) days or both.

We must now examine the sufficiency of the convicting evidence supporting the felony murder by aggravated child abuse conviction under a theory of neglect. Prior to being taken by the co-defendant and Dorantes, the victim lived with his biological father and was "one hundred percent normal and healthy." Sometime in February 2003, the co-defendant went to her sister's apartment and asked for money because the victim "had burned himself with some corn cobs that she was cooking." A week later, the co-defendant returned to the same apartment, and the victim was observed sitting inside a van driven by Dorantes "in a position like maybe not to hurt himself," protecting his buttock area. Maria, the co-defendant's other sister, testified that on February 20, 2003, the co-defendant came to her job crying and asked for money because the victim was very sick and needed medicine. Maria then observed the victim inside a van driven by Dorantes. When Maria saw the victim's condition, she screamed "why was the child like this . . .?" She asked Dorantes why he did not give the victim any medicine or take the victim to the doctor, and Dorantes replied "since he wasn't [the victim's] father he didn't have any reason to want to make [the victim] get better." She then asked Dorantes why he took the victim away from his father, and Dorantes said that "he didn't want to bring [the victim] but that [expletive referring to Patlan] wanted it to happen." Maria called the victim's name when she saw him in the van, and the victim did not move. She also confirmed that the clothes the victim was wearing when she saw him that day, were the same clothes he was wearing when his body was found three days later.

In addition, the medical examiner testified that the victim had been physically neglected. She testified that the burns to the victim's body had become infected, which indicated they were between two days to two weeks old. She explained that given the combination of the victim's injuries, the victim's cause of death was Battered Child Syndrome, "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse." She further explained that this term is also used to characterize injuries involving neglect. Finally, despite the victim's blunt trauma to his head, the medical examiner testified that the victim would have soon died had the infections from the burns remained untreated.

Based on the above proof, we conclude that the evidence was sufficient to support Dorantes' conviction for felony murder during the perpetration of aggravated child abuse through neglect. The evidence showed that Dorantes knowingly failed to provide the victim with any medical assistance which resulted in the victim's serious bodily injuries. See e.g. State v. Kathryn Lee Adler, No. W2001-00951-CCA-R3CD, 2002 WL 1482704 at * 5 (Tenn.Crim.App., at Jackson, Feb. 19, 2002) (stating that although evidence did not show that the victim's injury "was a result of the convicted offense of aggravated child neglect rather than child abuse, it clearly establishe[d] that the victim was subjected to "a substantial risk of death" and "extreme physical pain" due to the defendant's neglecting to seek prompt medical attention.") app. denied (Tenn. Sept. 9, 2002). The record shows the facts presented by the State support a jury verdict of felony murder during the perpetration of aggravated child abuse based upon the neglect of the victim "so as to adversely affect the child's health and welfare," resulting in serious bodily injury. Accordingly, Dorantes is not entitled to relief on this issue.

**II. Photographs of Victim's Injuries.** Dorantes contends the trial court erred in allowing the State to introduce certain photographs of the victim's body because "they were not relevant to prove any fact at issue in this case, or, even if relevant, were so gruesome as to cause distress to any juror and prejudice him." The State argues that the probative value of the photographs outweighed any prejudicial effect.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978), cert. denied, 526 U.S. 1071 (1999). A photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. In addition, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951.). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Dr. McMaster testified that the autopsy photos were necessary to explain her medical testimony. The record reflects that a total of thirty-nine (39) photographs were submitted for the trial court to review. Although the trial court engaged in a lengthy discussion, considering the relevance of the photos as well as weighing their probative value against any unfair prejudicial effect, the trial court did not specify which photos it referred to on the record. Nevertheless, the trial court excluded twenty-six (26) of the thirty-nine (39) photographs. We have also specifically reviewed the photographs admitted during the medical examiner's testimony and conclude that the trial court did not abuse its discretion by their admission. Accordingly, Dorantes is not entitled to relief on this issue.

**III. Denial of Special Jury Instruction on Aggravated Child Abuse.** Dorantes argues that the trial court erred when it refused to provide the jury with a special instruction that "would have ensured that the jury . . . returned verdicts based on acts of abuse, and not a continuing course of neglect." The State argues that the trial court did not err in refusing the special instruction, that this court has previously rejected the same argument in Hodges, 7 S.W.3d at 622, and that the supplemental jury instruction was unwarranted because the trial court's instruction was a proper statement of the law and was consistent with the indictment.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a defendant also has a right to a

correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000).

Additionally, special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). The refusal to grant a special request for instruction is error only when the general charge does not fully and fairly state the applicable law. Id. On appellate review, a jury instruction must be considered in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004).

Here, Dorantes requested the trial court to instruct the jury as follows:

For you to find the accused guilty of aggravated child abuse the State must prove that the defendant affirmatively committed an abusive action which resulted in serious bodily injury to the victim. Failure by either defendant to protect or seek treatment is not proof of abuse as to satisfy the elements of child abuse.

The trial court declined to provide the jury with the above instruction and instead instructed them, in relevant part, as follows:

Any person who commits the offense of aggravated child abuse is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant did knowingly, other than by accidental means, treat a child in such a manner as to inflict injury; and (2) that the act of abuse resulted in serious bodily injury[.]

We acknowledge that following the 2005 amendment to the child abuse and neglect statute, this Court noted that when a defendant is charged with both aggravated child abuse and aggravated child neglect, the trial court should issue a jury instruction that jurors may find the defendant guilty of one of the two charged offenses, but not both. State v. Vernita Freeman, No. W2005-0294-CCA-R3-CD, 2007 WL 426710, at *9 (Tenn. Crim. App., at Jackson, Feb. 6, 2007). This Court specifically stated:

The determination of whether the State is preceding upon alternative theories of prosecution or upon separate and distinct crimes should be resolved at a jury instruction conference in order that the jury may be properly instructed with regard to their verdict. Obviously, if the State is proceeding upon alternative theories, the

jury should be instructed that they can find the defendant guilty of one or the other of the theories, but not both.

Id.; see also State v. Randy Lee Ownby, No. M2007-01367-CCA-R3-CD, 2009 WL 112582, at *17 (Tenn. Crim. App., at Nashville, Jan. 14, 2009). However, based on our prior discussion of the law applicable at the time of the instant offense, we conclude that the trial court provided the jury with a correct and complete charge of the law. Dorantes is not entitled to relief on this issue.

**IV. Election of Offenses.** Here, Dorantes argues that the trial court erred in denying his request to require the State to make an election of offenses because the State presented evidence that the victim sustained head trauma as well as infected burns, bruises, abrasions, and puncture wounds. Relying on State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000), the State argues the trial court properly denied Dorantes' request because the evidence at trial did not establish multiple discrete acts but instead "established an ongoing pattern of abuse that ultimately claimed the victim's life."

The Tennessee Supreme Court has previously held:

> [W]hen the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought. This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. This right to a unanimous verdict has been characterized by this Court as fundamental, immediately touching on the constitutional rights of an accused . . . .

Adams, 24 S.W.3d at 294 (internal citations and quotations omitted).

In addition, "[w]here the State presents evidence of numerous offenses, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts." State v. Hodge, 989 S.W.2d 717, 721 (Tenn. Crim. App. 1998). Failure to issue a jury instruction on election to insure unanimity constitutes reversible error. Id.

We conclude that election was not required in this case. As discussed in Hodges, supra, a defendant convicted of felony murder by aggravated child abuse "could only have been convicted of the same offense: a killing committed in perpetration of or attempt to perpetrate aggravated child

-15-

abuse . . . ." <u>Hodges</u>, 7 S.W.3d at 624. Presenting two alternative means for culpability for a single offense does not pose a threat to the defendant's constitutional rights. <u>Id.</u> Accordingly, under the law at the time of the instant offense, the State was not required to elect a theory of prosecution. <u>Id.</u> at 625. Dorantes is not entitled to relief on this issue.

**V. <u>Sentencing.</u>** Dorantes contends that his twenty-two-year sentence for aggravated child abuse was excessive. Specifically, Dorantes argues the trial court applied enhancement factors based on facts not found by a jury in violation of <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004). In addition, Dorantes claims the trial court further erred by ordering the twenty-two-year aggravated child abuse sentence to be served consecutively to the previously imposed sentence of life imprisonment for first degree felony murder based on aggravated child abuse. In response, the State concedes the trial court erred when it applied certain enhancement factors but maintains that Dorantes' sentence is sufficiently supported by his criminal history. The State also contends the trial court properly imposed a consecutive sentence. We have already determined that the aggravated child abuse conviction must be reversed and vacated. Nevertheless, we hold that <u>Blakely</u> was violated and reduce the aggravated child abuse conviction sentence to twenty-one years. We further conclude that consecutive sentencing was proper.

## Conclusion

We conclude that the evidence was insufficient to support Dorantes' aggravated child abuse conviction. However, we also conclude that the evidence was sufficient to support Dorantes' conviction of felony murder by aggravated child abuse through neglect. We further conclude that the trial court properly denied Dorantes' motions to require the state to elect which prosecution theory it was relying upon at trial and to provide the jury with a special jury instruction. Accordingly, we reverse the judgment of the trial court in regard to the aggravated child abuse conviction. The judgment of the trial court in regard to the felony murder conviction is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE